## Case No. 15,136.

### UNITED STATES v. FORTY–THREE GALLONS OF WHISKY.

[19 Int. Rev. Rec. 158.]

District Court, D. Minnesota. May, 1874.[1]

CONSTITUTIONAL LAW—INDIAN TREATIES—RESTRICTIONS ON STATE SOVEREIGNTY.

[After a new state has been admitted into the Union upon an equal footing with the original states, the United States have no authority to abridge its sovereign powers over territory embraced within its limits, by making a treaty with an Indian tribe occupying the same, by the terms of which the acts of congress regulating trade and intercourse with the Indians and providing for the forfeiture of certain goods, stores, etc., of any Indian agent who is about to introduce spirituous liquors into the Indian country, are extended over the lands occupied by the tribe, to the exclusion of the state's jurisdiction.]

The United States has filed a libel of information against forty-three gallons of whisky, sundry peltries, and other goods and merchandise seized as forfeited by virtue of the twentieth section of the act of congress approved June 30, 1834 [4 Stat. 732], as amended by the act passed February 13, 1862 [12 Stat. 338], which, it is claimed, is now in force over the territory where this seizure was made. There are three special counts in the libel. The first, in substance, sets forth that on February 12, 1872, Bernard Lariviere, a white person of the village of Crookston, in the county of Polk, and state of Minnesota, did unlawfully carry and introduce into said village, which is located upon the territory ceded to the United States by treaty with the Red Lake and Pembina bands of Chippewa Indians, made and concluded October 3, 1863, the spirituous liquors particularly described, contrary to the treaty, and the act of congress above cited; that an Indian agent, duly appointed, having reason to suspect, and being informed that spirituous liquors had been introduced by said Lariviere into said county of Polk in violation of the act of congress, searched and caused to be searched, the goods, merchandise, peltries, etc., which he had in his possession at Crookston, in the ceded territory aforesaid; upon which search the whisky was found stored, packed and mingled with and in the packages, goods and peltries, and in the places of deposit of said Lariviere, and was so carried and introduced into the ceded territory, contrary to the form

of the statute of the United States in such cases made and provided; and was seized and taken by the Indian agent as forfeited, together with all the goods and peltries, etc., so found. The second count sets forth that the whisky was introduced with the intent to sell, dispose of, and distribute the same to and among the bands and tribes of Chippewa Indians, under the charge of an Indian agent, who frequented the village of Crookston, and who lived upon the reservation near that place. The third count is abandoned. The information prays that the said goods, merchandise, peltries, etc., may be decreed and declared forfeited, and the forfeiture properly enforced. Lariviere and [Charles] Grant have filed claims to the property, and exceptions to the information, and demur thereto.

Wm. W. Billson, U. S. Atty.
Davis, O'Brien and Wilson, for Lariviere.
W. M. McCarty, for Grant.

NELSON, District Judge. It is necessary, to a proper understanding of this controversy, to examine the act of congress admitting the state of Minnesota into the Union [11 Stat. 285], the twentieth section of the act of June 30, 1834 [4 Stat. 732], as amended in 1862 [12 Stat. 338], and the seventh article of the treaty of 1863 [Id. 1250], under which, it is claimed, this proceeding is properly instituted. The state of Minnesota was admitted into the Union May 11, 1858, and the locus in quo is within the boundaries prescribed by the act of congress authorizing a state government. The first section of the act declares: "That the state of Minnesota shall be one, and is hereby declared to be one, of the United States of America, and admitted into the Union on an equal footing with the original states in all respects whatever." There is no proviso or limitation in the act with reference to the jurisdiction of the state over any portion of the territory occupied by the Indian tribes within the boundaries prescribed by congress, and the constitution of the state nowhere intimates that this territory is withdrawn from its general jurisdiction.

If the jurisdiction of this court in this proceeding can be sustained, the fact being undisputed that the introduction of whisky was upon the ceded land, it must exist by virtue of the treaty made with the Chippewa bands of Indians in 1863. The seventh article is as follows: "The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, shall be in full force and effect throughout the country hereby ceded, until otherwise directed by congress or the president of the United States." The law prohibiting the introduction of spirituous liquors contemplated by this treaty, is found in the second section of

the trade and intercourse act of 1834, as amended February 13, 1862, viz.: "*  *  * And if any Indian agent * * * has reason to suspect, or is informed that any white person or Indian is about to introduce or has introduced any spirituous liquor * * * into the Indian country * * * it shall be lawful for such agent * * * to cause the boats, stores, packages, wagons, sleds, and places of deposit of such person to be searched, and if any liquor is found therein, the same, together with the teams, etc., conveying the same, and the goods, packages, and peltries of such ·person, shall be seized and delivered to the proper officer, and shall be proceeded against by libel in the proper court and forfeited," etc.

The only defence under the statute to the charge, is the introduction by order of the war department or some authorized officer. The county of Polk is a portion of the territory ceded by this treaty, and has been organized for many years, and all the civil officers recognized by the constitution and laws of the state of Minnesota are residing therein, and in the exercise of their full power and authority. The white settlements are increasing, and towns and villages are springing up with wonderful rapidity. Already a railroad authorized by the state and endowed by its bounty, traverses the entire county, and the village of Crookston, where this merchandise was seized, is one of the stations. The trade and traffic in that part of the state, although sparsely inhabitated, is quite large and the wants of a frontier settlement are supplied by· the merchants living in the village.

The question, therefore, involved in this case, is one of no ordinary importance to the people of this state, and particularly the settlers in Polk county. The ultimate decision must depend upon the extent of the power of the federal government, through the executive and senate, to restrict by treaty stipulations with the Indian tribes in our midst, the political and sovereign rights of this state. Until the act of congress of 1871 (10 Stat. 566), the power of the government to make treaties with the Indian tribes residing within the limits of a state has never been questioned, and I will dismiss this part of the case by simply saying, that in my opinion, treaties with the tribes and bands of Indians in our state, by which cessions of wild and uncultivated but arable land are secured to civilization and settlement, were the fulfillment of implied obligations on the part of the United States to this state, when it was admitted into the Union on an equality with the original states. The authority to make treaties, and the subjects embraced therein, must have some limit. This power can not be exercised to override other parts of the federal constitution, or to overturn the fundamental principles of our government. True, the constitution of the United States declares a treaty to be the supreme law of the land, but it has no greater force or effect than a legislative enactment, and may even be annulled by a subsequent act of congress, provided the subject matter be within the legislative power of the latter. [Taylor v. Morton, Case No. 13,799.] It is conceded that treaties with the Indian tribes, although "domestic dependent nations," are of equal vitality with those with foreign nations, so far as the treaty making power acts within the constitutional limits. But it is important to understand, in this connection, that the rights of the Indians, the power of the federal constitution over them and over their property, and the stipulations in the various treaties with them, have never been recognized in the constitution of this state or the act of congress admitting it; so that at the time this treaty was concluded, the jurisdiction of the state over all the territory occupied by the Indians was undoubted, except so far as the regulation of commerce with them might give congress control.

It is claimed that the act of congress above referred to, with the assent of the state to the conditions imposed by the federal government, constitute a compact of guaranty, and limit the power of the United States to treat with the Indian tribes within the boundaries of the state, which would forbid insertion of a stipulation in a treaty, diminishing in any manner the sovereignty of the state without its consent. This treaty of 1863 ceded a large tract of land within the boundaries of the state of Minnesota and the territory of Dakota. So far as the seventh article attempts to interfere with the internal and domestic commerce of the state of Minnesota, or abridge the rights of its citizens, or withdraw its jurisdiction without its assent over the tract of land ceded, it is certainly an interference with the sovereignty of the state. The laws creating courts of justice for the protection of the liberty and property of its citizens would be thereby obstructed to the extent that the laws of the United States recognized by this treaty, may operate upon them. If the jurisdiction of the federal courts to enforce the penalties and forfeitures accruing under the law forbidding the introduction of spirituous liquor is once admitted, it necessarily excludes the jurisdiction of the state courts and all the police laws, and others recognizing the traffic in the interdicted article. It cannot admit of doubt that under such circumstances Minnesota would not stand "upon an equal footing with the original states." The federal government in the treaty with Great Britain, where the contract settled a disputed boundary question, would not undertake to divest any state of territory over which it claimed to exercise jurisdiction, without procuring the assent of the state, in advance, or making the-

validity of a particular stipulation conditional upon future favorable legislation by the state interested. See Ashburton Treaty, 8 Stat. 554; Lawr. Wheat. Int. Law, pp. 494, 876, and notes.

It has been urged by some writers that the acquisition of foreign territory under the treaty making power of the United States necessarily concedes that of alienating territory and abridging state sovereignty; but the correspondence of the commissioners and the final conclusion in the above treaty, would seem to deny the power to alienate without the consent of the state interested. The treaties cited by the United States attorney, all relate to the status of foreigners residing within the United States, or to their property. There can be no doubt about the power of the government by treaty to protect the persons and property of foreigners, and remove them from the operation of a particular law of a state, passed for the special purpose of reaching them. So in the case of tribes of Indians; their persons and property could have been protected by treaty stipulations, although within the limits of the state, any law of the state to the contrary. To make such stipulation is within the power of the government under the constitution, for upon congress is conferred the regulation of commerce with foreign nations and with the Indian tribes; and the general treaty-making power could properly contract with reference to these subjects. But to say that a barbarous semi-sovereign community under the protectorate of the United States, and within its geographical limits, can by treaty stipulate away any part of the sovereignty of a state guaranteed by the supreme federal government on its admission into the Union, is, in my opinion, inconsistent with the nature of our government.

I have arrived at the conclusion, therefore, that until the assent of the state of Minnesota is obtained, the seventh article of the treaty of 1863, is inoperative, to the extent of demanding a forfeiture of the spirituous liquor and other merchandise, for any acts charged to have been committed by the person named in the libel. The exceptions and demurrer are sustained, and the property must be restored. See U. S. v. Ward [Case No. 16,639]; U. S. v. Sa-Coo-Da-Cot [Id. 16,212]; U. S. v. Bailey [Id. 14,495]; Kansas Indians, 5 Wall. [72 U. S.] 737.

[NOTE. The judgment of this court was affirmed in error by the circuit court. Case unreported. The United States then sued out a writ of error to the supreme court, which reversed the judgment, and remanded the case with directions to overrule the demurrer. 93 U. S. 188. Upon the new trial in the district court there was a verdict and judgment for the claimants. Case unreported. This judgment was again affirmed by the circuit court (case unreported), and again reversed upon error by the supreme court, which again remanded the cause for a new trial. 108 U. S. 491, 2 Sup. Ct. 906.]